# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA LEWANDOWSKI, | 1:07cv1777 DLB |
| Plaintiff, | ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| v. | |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

## BACKGROUND

Plaintiff Angela Lewandowski ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed her application on December 17, 2003, alleging disability due to a mental illness, problems with her feet and back, and an inability to read and write. AR 123-127, 137.

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On February 4, 2008, the Honorable Lawrence J. O'Neill reassigned the case to the undersigned for all purposes.

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

After the claims were denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 107-111, 112-117, 118. On January 25, 2006, ALJ Bert Hoffman held a hearing. AR 32-83. ALJ Hoffman issued a decision denying benefits on March 10, 2006. AR 13-24. The Appeals Council denied review on October 19, 2007. AR 4-6.

Hearing Testimony

ALJ Hoffman held a hearing on January 25, 2006, in Fresno, California. Plaintiff appeared with her attorney, Robert Christenson. AR 32.

Plaintiff testified that she was 40 years old and completed the third grade. She has difficulty reading and writing, but was currently attending Porterville College. AR 35-36. She explained that she can attend college because her books are on audio, she has a note keeper, uses a tape recorder, takes tests while a computer reads her the questions and she speaks the answers, and uses her daughter for help. AR 36-37. She thought she could read only a "Mickey Mouse" book. AR 36. In the one class that she took without her daughter's help, she received an "F." AR 37. Her daughter helps her with homework and tests. AR 38. Plaintiff believed that her teacher and the Administration knew her daughter was helping. AR 39. Plaintiff explained that she attends school because her daughter goes there and because of her past drug use, she needs to stay busy. AR 43. She did not plan on doing anything with the education. AR 43. Plaintiff further testified that she receives $1,000 every two and a half months to attend school. She spends about an hour and a half a day at school, three days a week. AR 46.

As for past work, Plaintiff testified that she worked in the prison kitchen but was fired because she couldn't keep up. AR 49. She moved to a laundry position in the prison but was fired because she put too many clothes in the washer. AR 49. Before 1990, she was a waitress. She was fired from that job, too, because other waitresses were doing her tickets for her. AR 50.

Plaintiff testified that she could not work because her feet and legs hurt. She said the bones in her feet are deteriorating and she is scheduled for surgery on February 15. AR 50. As soon as her right foot heals from surgery, she is going to have surgery on the left foot. AR 51. The pain in her legs is related to the problems with her feet. AR 51. Plaintiff also has pain in her

lower back that feels like an electric shock after she's been sitting for a while. She usually has to stand up or lay down to relieve the pain. AR 52. She takes Vicodin for pain, which sometimes helps. AR 53.

Plaintiff also goes to the Parole Clinic for mental problems. AR 54. She didn't know if her Prozac was helping, and thought it was making her more nervous. AR 54-55. She was taking three a day. AR 55. Plaintiff explained that she has problems being in crowds. She sits in the back at school, and if her daughter did not go, she would not go, either. AR 56. Plaintiff also has problems concentrating and paying attention to things. AR 56. She rubs a spot on her skin until it is raw and bleeding because it feels like it is being burned. AR 57. Her psychiatrist told her that this stems from the things her parents did to her. AR 57-58.

When questioned by her attorney, Plaintiff testified that the biggest mental problem preventing her from working is that she "can't stand men" and can't stand being told what to do by a man. AR 59-60.

Plaintiff thought that she could stand for 15 to 20 minutes before it starts to hurt, and could sit for about 30 minutes. Her 11 pound grandson is too heavy for her to lift, but it did not bother her to lift him when he was 9 pounds. AR 62. She can walk for one block prior to resting. She sleeps during the day because she doesn't sleep well at night. AR 63-64. When she is not with her daughter, she mainly stays in her room, in bed, and watches television because she feels safer in a small room. AR 65. She lays down to relieve back pain one to four times a day, for 15 to 20 minutes a time. AR 66-67. Plaintiff's daughter helps her cook microwave meals and does the vacuuming. Plaintiff cleans the bathrooms and her room. AR 81.

Plaintiff testified that she worked for two days at Sunnyside Auto Repair after her release from prison, but she was fired for being too slow. She told her parole officer that she quit because of a wage dispute and admitted that she lied to him because she was scared of getting into trouble. AR 68-69. Plaintiff was in prison on a conspiracy conviction. AR 69. She was previously convicted of receiving stolen property, a misdemeanor. AR 71.

1    For the past three months, Plaintiff has been teaching Sunday school class for an hour
2 after church. AR 72. She explained that if she could get mentally stable, she would like to work
3 with teenagers to teach them how to be drug-free. AR 78.

4    Medical Record

5    On June 11, 2002, Plaintiff underwent a mental health screening for the California
6 Department of Corrections ("CDC"). There were no signs of mental illness and Plaintiff was
7 cleared for general population. AR 219. Plaintiff also received a passing score on the cognitive
8 test. AR 222.

9    X-rays of Plaintiff's right foot taken on August 8, 2002, showed an old fracture of the
10 fifth proximal phalanx and a hallux valgus deformity with no acute fracture.

11    In Plaintiff's Initial Health Screening for the CDC, dated October 8, 2003, Plaintiff
12 indicated that she had no mental or physical problems. AR 198.

13    Plaintiff saw Chi Nguyen, M.D., on February 12, 2004, for complaints of nausea, a lump
14 on her left leg and painful bunions on her feet. On examination, she had a mild lipoma to the
15 proximal end lateral aspect of her left leg, near her knee. She also had a bunion on each foot,
16 worse on her left. AR 259.

17    Plaintiff saw Dr. Nguyen for complaints of bilateral foot pain on the front part of the sole
18 on March 22, 2004. On examination, there was a callous body on the median side of both feet, as
19 well as tenderness on pressure on the soles of both feet and prominence of the median side of
20 both first metatarsal bones. AR 257.

21    X-rays of Plaintiff's feet taken on March 23, 2004, revealed bilateral hallux valgus, but
22 no fractures, degenerative changes or dislocations. AR 256.

23    Plaintiff was seen in the emergency room on April 2, 2004, for back pain and spasms.
24 Straight leg raising was positive on the left at 30 degrees. AR 285. Plaintiff was diagnosed with
25 a lumbar strain. AR 285-289.

26    On April 8, 2004, Plaintiff returned to Dr. Nguyen for back pain, which she reported
27 began in 1999, when she fell on the ground from the first step. Plaintiff also reported that at
28 times, she had be in a wheelchair while in prison. She did not take her Motrin because it hurt her

stomach. On examination, there was mild tenderness on the lumbar spine. Straight leg raising was positive at 45 degrees. There was no evidence of muscular dystrophy on either leg. He assessed chronic low back pain with exacerbation, prescribed Darvocet and ordered x-rays. AR 255.

On May 4, 2004, Plaintiff saw Leslie H. Lessenger, Ph.D, for a consultive psychological evaluation. Plaintiff reported that she doesn't know how to work, doesn't like being around a lot of people, and wasn't smart enough to "do stuff." She also reported learning and emotional problems all her life and indicated that she had spent time in various mental institutions. On mental status examination, Plaintiff was oriented to person, time, place and the nature of her situation. Her speech was logical and organized, but somewhat simple. Her mood was generally euthymic, although she became tearful when discussing past abuse. She denied hallucinations and there was no evidence of a thought disorder. She was sometimes vague in her reports. Testing revealed a level of intellectual functioning in the extremely low to borderline range. AR 260-263.

Dr. Lessenger diagnosed post-traumatic stress disorder ("PTSD"), chronic, learning disorder, not otherwise specified, polysubstance abuse, in full sustained remission, borderline intellectual functioning and borderline personality disorder. Dr. Lessenger indicated that Plaintiff functions in the extremely low to borderline range of intellectual ability, although her memory skills were average. She demonstrated significant visual perception problems and said she was illiterate. Plaintiff also reported a history of severe childhood physical and sexual abuse, and if this history is corroborated, her symptoms of depression, anxiety and avoidance of people are best explained by a diagnosis of PTSD. AR 263.

Dr. Lessenger opined that Plaintiff had no restrictions on daily activities and no difficulties in maintaining social functioning, although Plaintiff reported anxiety around people. Plaintiff's concentration, persistence and pace were consistent with borderline intellectual functioning. Plaintiff could understand, carry out and remember simple instructions, but may have more difficulty as the complexity increases. She could respond appropriately to co-workers,

supervisors and the public.  In responding appropriately to usual work situations, Plaintiff may have issues due to per significant visual perceptual problems.  AR 263-264.

On May 7, 2004, Plaintiff saw Frederick R. Young, M.D., for a consultive examination. Plaintiff reported that she was unable to work because of major pain in her feet, back and shoulders.  She also reported mental issues and stated that she never had a job.  On examination, Plaintiff was obese.  She had normal range of motion in her neck and upper extremities.  There were no spasms or tenderness in her back.  Range of motion in her lower extremities was normal and her gait appeared normal.  Dr. Young opined that because of the minimal objective findings, Plaintiff should be able to perform normal duties.  AR 271-272.

Plaintiff was seen in the emergency room on May 21, 2004, for pain in her right flank/rib cage.  She was diagnosed with a back sprain and given Vicodin.  AR 275-279.

On June 9, 2004, State Agency physician Evelyn Aquino-Caro, M.D., completed a Psychiatric Review Technique form.  She opined that an residual functional capacity ("RFC") assessment was necessary based on Plaintiff's learning disorder, borderline intellect, PTSD and history of substance abuse, in remission.  She noted that Plaintiff's learning disorder did not satisfy the criteria of Listing 12.05, and her PTSD did not satisfy Listing 12.06.  In rating her functional limitations, Dr. Aquino-Caro opined that Plaintiff had mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace.  AR 294-308.

Dr. Aquino-Caro also completed a Mental Residual Functional Capacity Assessment. She opined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions.  In assessing her RFC, Dr. Aquino-Caro opined that Plaintiff could understand and remember simple instructions, sustain two hour periods of concentration throughout the day to accomplish unskilled work, relate to all people and adapt.  AR 308-310. This opinion was affirmed on September 28, 2004.  AR 310.

Plaintiff saw Paul R. Mayo, D.P.M., on February 8, 2005, for bilateral foot pain.  She was taking Tylenol occasionally for pain.  Physical examination revealed a significant equinus deformity bilaterally, severe hallux abductal valgus deformities and a very prominent medial first

metatarsal eminences with erythema. Plaintiff had hypermobility of both first rays and a significant collapse of both medial arches and eversion of both heels with weight bearing and in gate. She had decreased range of motion of both halluces at the first metatarsophalangeal joint ("MPJ") with weight bearing. Mild crepitus was noted at the first MPJs as well. Dr. Mayo diagnosed hallux abductal valgus, equinus, and neuritis. He discussed treatment options with Plaintiff, including conservative treatment and surgery. AR 316-317.

On March 1, 2005, Plaintiff complained of foot pain and nerve pain shooting up into her legs. The provider prescribed physical therapy and a TENS unit. ART 314.

Plaintiff complained of painful feet and legs on April 12, 2005. She had pain at her bunions. The provider suggested physical therapy or a TENS unit, which Plaintiff had not yet obtained, and discussed surgery. AR 313.

On April 20, 2005, Plaintiff underwent an initial mental health examination by James Murphy, Ph.D., as part of her parole and after she requested treatment for anxiety, depression and PTSD. Plaintiff reported that she was in some form of therapy almost all of her life, including hospitalizations. Plaintiff also reported severe childhood physical and sexual abuse, as well as abuse in a prior marriage. Plaintiff was currently going to school to be a drug and alcohol counselor. She reported that she was in generally good physical health, but had some feet, stomach and back problems. On mental status examination, Plaintiff's concentration was poor when using number retention clinical trials, but her immediate short-term memory and long-term memory seemed fair. Her intelligence level was low-average. Her mood was depressed and anxious at times, with a partial blunted affect. Her judgment and decision-making were fair. Dr. Murphy diagnosed polysubstance dependence, learning disorder, not otherwise specified, and borderline personality disorder. AR 329-330.

On June 7, 2005, Plaintiff was seen in follow-up for foot pain, which she described as "a nail" and "burning." She had pain to palpation on the right. Surgery on her right foot was discussed. AR 312.

Plaintiff saw Francis Cunanan, M.D., on June 15, 2005. He diagnosed major depressive disorder with generalized anxiety disorder and prescribed Paxil. AR 390.

1    Plaintiff saw Christopher Gillespie, M.D., on June 29, 2005. Plaintiff reported problems
2 with depression, bulimia, and PTSD. He did not perform an exam, but instructed Plaintiff to
3 continue with her behavioral health treatment. AR 382.
4    On June 29, 2005, Plaintiff saw Cathy Galavotti, PsyD. Plaintiff was "pretty high
5 functioning," has several jobs, goes to school and takes care of her kids. She was "doing quite
6 well in her life." She was in good spirits and diagnosed with PTSD, bulimia, and chronic
7 symptoms of depression. Plaintiff had a reaction to Paxil and "ended up in the hospital." AR
8 381.
9    Plaintiff returned to Dr. Gillespie on July 29, 2005, to get a referral for surgery. She was
10 given a referral for surgery and medication for insomnia. AR 358.
11    On November 21, 2005, Dr. Gillespie completed an RFC Questionnaire. He indicated
12 that he treated Plaintiff approximately five times between August 26, 2005, and November 21,
13 2005. He diagnosed equinus, hallux abductus valgus, PTSD, bulimia and depression and noted
14 that her prognosis was fair. Plaintiff has pain in both feet and legs, and the pain in her heels and
15 calves is "quite severe and chronic." He indicated that there were no objective signs to support
16 Plaintiff's impairments. Her medications can cause drowsiness. Plaintiff's depression, anxiety
17 and other psychological factors affect her physical condition. AR 402-403.
18    Dr. Gillespie opined that Plaintiff's pain would frequently interfere with her attention and
19 concentration, and believed that she could maintain attention and concentration for 20 minutes at
20 one time. She was capable of a low stress job. Plaintiff could walk for one block before needing
21 to rest, could sit for 30 minutes at a time and could stand for 10 minutes at a time. In an eight
22 hour day, she could stand/walk less than two hours and could sit for about four hours. She
23 needed to walk every 30 minutes, for about five minutes. Plaintiff would need a job that allows
24 at-will shifting of positions and unscheduled breaks. Plaintiff could frequently lift less than 10
25 pounds, 10 pounds occasionally and 20 pounds rarely. She could frequently perform neck
26 movements, occasionally twist and rarely stoop, crouch and climb. Plaintiff would likely be
27 absent more than four days per month. AR 403-406.
28

ALJ's Findings

The ALJ found that Plaintiff had a learning disorder, not otherwise specified, and equinus, hallux abductal vagus, which were severe impairments. AR 18. He found that she retained the RFC to lift and carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk for six hours and sit for six hours. Plaintiff could perform simple, routine tasks. AR 21. He further found that Plaintiff had no past relevant work, but could perform a significant number of jobs in the national economy. AR 23.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Secretary applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of

9

such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).[3] Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations (20 CFR §§ 416.920(b)) (learning disorder, not otherwise specified, and equinus, hallux abductal vagus); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) has no past relevant work; but (5) retains the RFC to perform a significant number of positions in the national economy. AR 18-23.

In challenging the decision, Plaintiff argues that the ALJ erred (1) in rejecting the opinion of Dr. Gillespie; (2) in failing to use a Vocational Expert ("VE"); (3) in failing to find that Plaintiff's borderline intellectual functioning was a severe impairment; (4) in failing to find that Plaintiff met or equaled Listing 12.05C; and (5) in finding Plaintiff not credible.

## **DISCUSSION**

A.   Dr. Gillespie's Opinion

Plaintiff first argues that the ALJ erred by rejecting the opinions set forth in Dr. Gillespie's November 21, 2005, assessment.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995). Where the treating doctor's opinion is not

---

[3]All references are to the 2002 version of the Code of Federal Regulations unless otherwise noted.

contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F.3d at 830. Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989). The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctor's, are correct. *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

In formulating his RFC, the ALJ discussed his treatment of all three opinions relating to Plaintiff's physical abilities. He rejected the opinions of the consultive physician and the related State Agency physician, who both found no physical limitations, as not supported by the evidence. AR 22. The ALJ explained that the evidence demonstrated that Plaintiff had severe equinus and hallux abductal valgus and was scheduled for surgical correction. Based on this, the ALJ determined that Plaintiff had, in fact, more limitations than set forth by either the consultive or non-examining physicians. AR 22.

However, the ALJ did not accept Dr. Gillespie's extreme limitations, either. He first explained that although treating physician's opinions are generally entitled to significant weight, Dr. Gillespie's opinion was not well supported by Plaintiff's level of activities. AR 22. Indeed, as the ALJ explained in other portions of his decision, Plaintiff attended college four days a week, which involved a "significant amount of walking around on the campus, going from the parking lot to her various classes." AR 20. The ALJ also explained that Plaintiff is able to carry out routine ambulatory activities "such as attending college, preparing meals and doing light household chores." AR 19. He also noted that Plaintiff has no problems dressing or bathing. AR 21. Given Plaintiff's activities, the ALJ was entitled to question Dr. Gillespie's opinions. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ may reject a treating opinion that is unsupported by the record as a whole or by objective findings).

11

1    The ALJ next explained that his opinions were not consistent with his own treating notes.
2 For example, "on the 4 occasions that he treated the claimant from June 2005 to September 2005,
3 he mentions her bilateral foot problem only once, in July 2005." AR 22-23. Of the four visits,
4 two were for chronic diarrhea and one was for bulimia and other emotional issues. AR 335, 342,
5 382. During the visit relating to her feet, Dr. Gillespie noted that Plaintiff had been diagnosed
6 with hallux abducto valgus and equinus, and that she was concerned that her surgery would not
7 be covered by insurance. Plaintiff requested a referral to the podiatrist she had been seeing for
8 insurance purposes and also complained of insomnia. Examination was "deferred." AR 358.
9 From the records, then, it does not appear that Dr. Gillespie ever conducted his own examination
10 of Plaintiff's feet. In fact, on his assessment, he specifically states that there are no clinical
11 findings to support his opinions. AR 403. A lack of supporting clinical findings is a legitimate
12 reason to reject a treating physician's conclusion. *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th
13 Cir. 1989).
14    Plaintiff attempts to overcome the lack of Dr. Gillespie's own clinical findings by
15 suggesting that in July 2005, he was "so concerned about [her] bilateral foot problem [that] she
16 was referred to the podiatry clinic." Opening Brief, at 9. However, it appears from his treatment
17 notes that Plaintiff only mentioned the issue because she thought she may need the "official
18 referral" for insurance purposes. AR 385. As noted above, Dr. Gillespie never even examined
19 Plaintiff's feet.
20    Finally, the ALJ notes that the day after Dr. Gillespie referred Plaintiff to a psychiatrist,
21 she was noted to be "pretty high functioning" and in good spirits. AR 23, 381-382. Dr.
22 Galavotti, who saw Plaintiff in follow-up for PTSD, bulimia and stress management, reported
23 that Plaintiff was "pretty high functioning" as she had several jobs, goes to school, takes care of
24 her kids and distracts herself by staying very busy. AR 381. She was in good spirits during her
25 examination. AR 381. Plaintiff argues that this only demonstrates that she was in good spirits
26 and high functioning "only" at this visit, and that it does not mean that she is well enough to
27 work. Opening Brief, at 9. However, the ALJ is not using Dr. Galavotti's statement to
28

demonstrate that she is well enough to work, but rather is using them to discredit Dr. Gillespie's contradictory November 2005 assessment.

The ALJ's rejection of Dr. Gillespie's November 2005 assessment was supported by substantial evidence and free of legal error.

B.   Use of VE

Next, Plaintiff contends that the ALJ should have used a VE to determine what jobs exist for a person with Plaintiff's RFC. She points to the ALJ's finding that Plaintiff had moderate difficulties in maintaining concentration, persistence or pace.

An individual's RFC is a determination of how much that person can do, despite his limitations. 20 C.F.R. § 416.1445. Here, the ALJ found that Plaintiff could lift and carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk for six hours and sit for six hours. Plaintiff could also perform simple, routine tasks. AR 21. Given this RFC, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy. In this regard, he determined that her non-exertional limitation to simple, routine tasks had little or no effect on the occupational base of unskilled light work. AR 24. The ALJ was entitled to make this determination. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988) (the determination of whether a non-exertional limitation significantly limits the range of work the claimant is able to perform is left to the ALJ). *Id.*

Plaintiff's argument, however, tries to impose a step two finding on the RFC determination. The ALJ's discussion of the level of Plaintiff's mental impairment was made in the context of the psychiatric review technique, which is used to rate the degree of limitations in four broad areas and ultimately determine the severity of a claimant's mental impairment. 20 C.F.R. § 416.920a. Ultimately, the ALJ decided that although Plaintiff had "moderate difficulties in maintaining concentration, persistence or pace," her mental impairment was not severe. AR 21.

Having determined the severity of Plaintiff's impairments, the ALJ moved on to her RFC, which included a limitation to simple, routine tasks. AR 21. This limitation takes into consideration the ALJ's findings in his psychiatric review technique. *Stubbs-Danielson v.*

13

*Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (a restriction to simple, repetitive tasks adequately captures deficiencies in concentration, persistence and pace).

Accordingly, the ALJ's decision to proceed to step five without VE testimony was supported by substantial evidence and free of legal error.

C.     Plaintiff's Borderline Intellectual Functioning

Plaintiff next argues that the ALJ erred in failing to find her borderline intellectual functioning a severe impairment. In support of her argument, she cites Dr. Lessenger's diagnosis of borderline intellectual functioning, and believes that since the ALJ credited her opinion, he should have found the impairment to be severe.

An impairment or combination of impairments is found "not severe" at step two if the medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities). SSR 85-28. In determining whether an impairment or combination of impairments is "severe," an ALJ should carefully examine the medical findings that describe the impairments and make an "informed judgment" about the limitations and restrictions the impairment and related symptoms impose on the person's physical and mental ability to do basis work activities. SSR 96-3p.

Plaintiff is correct that the ALJ gave great weight to Dr. Lessenger and the State Agency physician, who "concluded that despite claimant's learning disorder and low IQ scores which suggest borderline intellectual functioning, she is able to understand, carry out, and remember simple instructions, respond appropriately to coworkers, supervisors and the public, and deal with changes in a routine work setting." AR 23.

Whether the ALJ found her borderline intellectual functioning severe is, however, irrelevant as the ALJ was required to account for *any* resulting limitations in the RFC finding, whether from a severe or non-severe impairment. He did so here by limiting Plaintiff to simple, routine tasks. Indeed, Dr. Lessenger concluded that Plaintiff could understand, carry out and

remember simple instructions, and respond appropriately to co-workers, supervisors and the public.  AR 263-264.

The ALJ's analysis of Plaintiff's borderline intellectual functioning was therefore supported by substantial evidence and free of legal error.

D.     Listing 12.05C

In a similar argument, Plaintiff contends that the ALJ erred in failing to find that her mental impairment met or equaled Listing 12.05C (Mental Retardation).

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity." 20 C.F.R. § 416.925(a).  Most of these impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets all of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a).  Under the law of this circuit, "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments."  *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990).

Listing 12.05 provides, "[m]ental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.05.  Subsection C requires (1) a valid

verbal, performance, or full scale IQ of 60 through 70; and (2) a physical or other mental impairment imposing an additional and significant work-related limitation of function. *Id.*

Here, the ALJ found that Plaintiff's mental impairments (learning disorder, not otherwise specified, and a history of substance abuse and alcoholism in full remission) did not meet or equal the criteria of section 12.05. He explained that although her IQ scores were in the extremely low to borderline range of intellectual ability, her memory skills were average and Dr. Lessenger concluded that she was not severely limited. AR 20. She has only some mild symptoms or some difficulty in social, occupational or school functioning, but generally functions pretty well and has some meaningful interpersonal relationships. The ALJ also cited Dr. Lessenger's conclusion that Plaintiff could understand, carry out and remember simple instructions. AR 20.

The ALJ's determination was supported by substantial evidence and free of legal error. Plaintiff suggests that she is illiterate and dropped out of school in the third grade, facts which she contends support a finding of the onset of mental retardation before age 22. However, there is no evidence in the record to support a finding of mental retardation at *any* age. To the contrary, the evidence demonstrates that despite Plaintiff's borderline intellectual functioning, she is able to perform simple, routine tasks in a work setting. Although Plaintiff downplays her college education, the fact remains that she is able to attend classes, take exams "orally" and listen to books "on tape." Plaintiff also testified that she teaches Sunday school classes. AR 72. She further testified that if she could get "mentally stable," she would like to teach teenagers how to be drug-free. AR 78. The evidence simply does not support a finding that she met or equaled Listing 12.05C.

E.    Plaintiff's Credibility

Finally, Plaintiff argues that the ALJ erred in failing to find her credible.

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991). "An ALJ is not 'required to believe every allegation of disabling pain' or other non-exertional impairment," *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (citation omitted). In rejecting the

complainant's testimony, "the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Secretary of Health and Human Services,* 846 F.2d 581, 584 (9th Cir. 1988)). Pursuant to Ninth Circuit law, if the ALJ finds that the claimant's testimony as to the severity of her pain and impairments is unreliable, the ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

"The ALJ may consider at least the following factors when weighing the claimant's credibility: '[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [her] testimony and [her] conduct, [claimant's] daily activities, [her] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which [claimant] complains." *Id.* (citing *Light v. Soc. Sec. Admin.,* 119 F.3d 789, 792 (9th Cir. 1997). "If the ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Id.*

In assessing Plaintiff's credibility, the ALJ explained that although Plaintiff complained of disabling foot and back pain, there was no objective evidence of any spinal abnormalities, her orthopedic consultive examination was within normal limits and she is able to ambulate without an assistive device. AR 22. Elsewhere in his opinion, he explained that Plaintiff attends college four days a week, which "entails a significant amount of walking around on the campus, going from the parking lot to her various classes." AR 20. The ALJ may use "ordinary techniques" in addressing credibility. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

In further examining Plaintiff's college attendance, the ALJ explained that he did not credit Plaintiff's testimony that she does "nothing" to get her grades, which range from "As" to "Cs". "The claimant has successfully completed 3 semesters at this college, which indicates a significant level of perseverance, time management, and determination to achieve goals she has set for herself." AR 20.

In addition to her college attendance, the ALJ noted Plaintiff's other daily activities, which included taking care of her children, light household chores and meal preparation, going out to eat and watching movies, making and selling artificial flowers, going to church every week and doing arts and crafts with children in Sunday school. AR 19, 20, 21, 23.

The ALJ also noted that Plaintiff has received mostly conservative treatment, except for a suggested surgical intervention for her foot problems. AR 22. She was never prescribed an assistive device. In fact, Plaintiff failed to report for the TENS unit therapy her physician recommended to help control the pain. AR 19, 313, 314.

The ALJ's credibility determination was therefore supported by substantial evidence and free of legal error. Although Plaintiff disagrees with the finding, the ALJ's credibility determination was sufficiently specific to permit the Court to conclude that the ALJ did not arbitrarily discredit her testimony. *Thomas v. Barnhart,* 278 F.3d 947, 958 (9th Cir. 2002).

### CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff, Angela Lewandowski.

IT IS SO ORDERED.

Dated:   **October 27, 2008**                    /s/ **Dennis L. Beck**
                                                   UNITED STATES MAGISTRATE JUDGE